This case this afternoon is F.S. Financial Services, Corp. v. Robert R. Williams. That's case number 4131085. For the appellate, David Cox, for the appellate, Robert Lindstrom. Mr. Cox, you may proceed. May it please the court. Mr. Lindstrom, good afternoon. My name is David Cox, and I represent Robert Williams, who is a 90-year-old patriarch of the Williams Farm Operation, primarily in Piatt County, and who has continued the farming business through his son, Jim Williams, who has a power of attorney. I'm going to be extremely brief today on this, because I think, unlike the case we argued this morning, the issues are more finite. And that'll leave plenty of time to answer any questions that you have that you haven't asked along the way. But I do want to state kind of a hierarchy for the arguments that we presented to the court here. This is a case that involves a half a million dollar note that F.S. extended credit to Robert Williams to buy F.S. products for use in the agricultural operation in Piatt County and thereafter. And I don't think that's in dispute, nor is the fact that, as I indicated in our brief, that amount has been repaid. The dispute is whether or not that note was extended and whether or not it's subject to default interest and attorney's fees under the contract. And that's the dispute that's been ongoing here, how much had to be repaid. Right now, everything has been paid. The difference in terms of the figures that we're talking about are 70,000 in terms of interest on top of the 500,000 for what was ultimately tendered pending resolution of the dispute, which is about $186,000. So the amount in controversy is about $116,000, which is significant enough to contest in court. Our client's position is that the agreement was extended in writing. The problem in this case is that my client does not have a copy of that writing, although the affidavit of Pam Williams indicates that she remembers seeing it in writing and that the extension occurred in writing. There's evidence that there was an extension of the due date on this original note for 500,000 so that Mr. Williams could buy additional product from FS. As a matter of fact, there's only one of these contracts that's in dispute. There were three total contracts for the farm operation. This is the one that's in dispute before this court today. So the issue is whether or not the note was extended, and then whether or not, given the dispute over whether or not there was a default. The issue of what interest and the fees had to be paid. We believe that the proper standard review on this case is de novo. I've cited a case that basically indicates in statutory interpretation cases that it's a de novo review, of course, putting this court in the position of the trial court. In essence, the hierarchy for our argument is as follows. We believe that the Illinois Uniform Commercial Code applies to this case for the following reasons. And of course, the striking difference between Mr. Lindstrom's argument and our argument, Mr. Lindstrom insists that the Illinois Credit Act controls, and the Illinois Credit Act, of course, I don't think is in dispute in terms of requiring extensions to be in writing. The Illinois Uniform Commercial Code is more broad than that. It does not require extensions to be in writing necessarily, and the court can go beyond the writings available to it to look at the negotiation and transaction history and the circumstances that the parties find themselves in. So we believe that the UCC applies for the following reasons. One, I've identified in the early part of my brief some statutory interpretation principles and the fact that the Illinois Uniform Commercial Code provisions that we believe come into play in this case were adopted after the Illinois Credit Act. To presume that the Illinois Credit Act is the sole remedy here on this case would be to assume that the General Assembly intended to leave the Illinois Credit Act completely intact and then pass the Illinois Uniform Commercial Code, which was passed later in time, the operative provisions here, which are 201A and 201B3. These are essentially the provisions indicating that a security agreement is effective according to its term between parties, and that you look at course of dealing between the parties and so forth. These provisions were enacted after the Illinois Credit Act, which would seem to indicate that the intent of the legislature was for the Uniform Commercial Code to apply to such disputes. And of course, to just define this case under the Illinois Credit Act would be to render provisions of the Illinois Uniform Commercial Code meaningless. So there are statutory interpretation principles that would discourage that. Now, at the time the contract was entered, FS believed that the Illinois Uniform Commercial Code would apply to disputes as well. Because if you look on page 16 of my brief, we quote extensively from the contract between FS and Mr. Williams. And that contract states, quote, the company shall have the right to the immediate exercise of all remedies of a secured party under the applicable uniform commercial code, end of quote. Does the contract also require any extensions to be in writing? It does, under most circumstances, yes. Still, in this case though, if the UCC applies, the UCC recognizes the doctrines of promissory estoppel and equitable estoppel, notwithstanding the contract language. Under these circumstances, again, my client believes that the extension was in writing. The problem is, we don't have a copy, and FS did not produce a copy. And FS denies that there is an extension in writing. So our first line position would be that the agreement was extended in writing. It's unfortunate that that's just not in the record. But promissory estoppel and equitable estoppel obviously apply to cases in which an agreement is reached between the parties, one party relies on the agreement, it's reasonable to do so, they do so to their detriment. And so we believe both of those apply. We believe that FS believed that the UCC applied because they mentioned it and cited it in their contract. And if the UCC applies, then the doctrines of promissory and equitable estoppel are directly applicable to this case, because there are circumstances, even in the absence of a writing, since neither party could produce one, that there are circumstances, there's evidence that indicates that they agreed to an extension and that this note should not have been treated in default. Of course, all this can be avoided if you go step back to the motion for summary judgment standard. One of the arguments we asserted in court is under the motion for summary judgment standard, which I know counsel in this court will be well familiar with. If there's a dispute of fact, then the case should be allowed to proceed to trial. Now, in this case, there's a very serious and material dispute of fact. FS asserts that there was no written extension. My client asserts that there is or was. We were not even allowed, or my client was not even allowed to pursue discovery further in this case, other than a simple denial of a request for production of documents from FS. So certainly there was no trial on the issue because summary judgment was granted to FS. So the concern here is there is a dispute of fact. And if the court considers that that dispute of fact was sufficient to allow this case to proceed to some sort of contested hearing with testimony, making people from FS appear and testify as to the circumstances of the extension, and one would presume they would testify truthfully and my clients would testify truthfully, then the court would have had before it this complete picture of the circumstances, the purchase of the additional product, a lot of circumstantial evidence that would indicate that there was an agreement and the parties were acting as if there was an agreement. So the court can even sidestep if it chooses to, the Illinois Commercial Code and the Illinois Credit Agreement, a credit act, the apparent conflict between the two, by concluding. Clarify where you see this conflict between the credit act and the Uniform Commercial Code. I'm not quite following your argument there. It appears to me that you're confusing a credit agreement with a security agreement. But go ahead. I think in this document they're one and the same. That the credit agreement that allowed the extension of 500,000 in credit, and then ultimately the extension in the due date so the additional credit could be produced, also operates as a security agreement because it places a lien on certain types of property during the pendency of this agreement. So I believe that the contract suffices and qualifies both. The essence of my argument is that the Illinois Credit Agreement requires any extension to be in writing. And that provision is cited in my brief. And if you look at 201A and 201B3 of the Uniform Commercial Code, it doesn't have that same requirement that any extension be in writing. And so that is the essence of my argument and the distinction between the two statutes. And the essence of your argument is a credit agreement is the equivalent, at least for purposes of these facts, as a security agreement. In this case, I believe it is, Your Honor, because they're one and the same document. All right. That does conclude my argument. I told you I would be brief. I'm happy to answer any questions the court has before I sit down. I don't see any at this time, but you will have rebuttals, so we'll hear from you then. Mr. Lindstrom. May it please the court, Mr. Cox. I'm Robert Lindstrom. I'm here from Galesburg today. I represent FS Financial Services Corporation. This is my first time to be in your beautiful courthouse. It's very, very nice. Thank you. I was here some 30 years ago, and Mr. Cox told me I was right. I was in the Supreme Court building back then, so I guess you've had a lot of change since that time. This is very nice. Thank you. Mr. Cox is correct. There really isn't any dispute about the facts here in terms of what we need to do to try to get to a solution to this problem. There's no question that Mr. Williams, by his son, signed a credit agreement, and it's also signed by a representative of my client. The document, obviously, was signed by a representative of Piatt County FS initially, and then it was assigned to FS Financial Services Corporation. So our view is the only issue before the court is whether or not the Credit Agreement Act applies to bar the affirmative defense that the credit agreement was orally modified. Mr. Lindstrom. Sure. Another issue that I asked you to address is the timing of the alleged extension agreement relative to when the assignment was made. So Piatt assigns to FS Financial Services, right, and then subsequent to that, it's alleged that there was an extension agreement entered into. How would any subsequent extension bind the original or bind the S&E? Well, there's two parts to your question there. First of all, we believe that any extension has to be in writing per the Act, but I understand the essence of your question. There is perhaps a little confusion on dates. The original line of credit note and security agreement is dated April 22nd, 2010, and there's reference in there to also being terms part of the agreement called the loan commitment. And there is a loan commitment that's part of the document, and it's dated, I believe it's May 10th of 2010, and it in fact sets forth the amount of the credit as well as its terms, how it's going to be paid back. Both the April, both the document signed in April and the document dated in May make reference to the other documents. I think they're fully integrated and both encompass the terms of the other. The interesting part of how that plays into this case is Mr. Williams in his affirmative defense says the document was orally modified April 22nd of 2010, yet in the brief filed in this case, and indeed in the affidavit offered by Mr. Jim Williams and his wife, they refer to this loan agreement as having been made in June of 2010. Well, I submit that is a very good reason why the Credit Agreement Act was passed, because between the time the affirmative defense was alleged and the answer to the complaint, I replied to say that's barred by the Credit Agreement Act, and it appears to us that that point people thought, uh-oh, that isn't good, we don't have a writing, so we better come back and find a different date, which is June, and then come up with an affidavit, and I'm not casting aspersions on people's credibility, but they're saying, well, I think I saw agreement that was in writing that extended the note, but I don't know where it is, and I don't have a copy of it, and I can't produce it. So that's why we have a Credit Agreements Act in this state, to address situations like this. So I think that there's no question that the documents flow together, they're fully integrated, but despite that fact, there still is not a written document that meets the requirements of the Credit Agreement Act that would extend the due date. The Credit Agreements Act is very clear. This is a commercial transaction, happens all the time in farming, credits extended by chemicals and product, so that meets the definitions of Section 1 of the Act. Section 2 describes that the document must be in writing, it must set forth the terms  Section 3 is the one that really is operative here, because it talks about actions that are not considered credit agreements, and the very key factor is, is an agreement by a creditor to modify or amend an existing credit agreement, or to otherwise take certain actions, switching to the end, including rescheduling or extending installments under an existing credit agreement. So clearly, a situation like this, where there's an allegation that the maturity date was extended, it's covered by the Act, and the Act applies, and I think it shows on all fours why we have the Act, and it's to protect all parties as to what the terms are of their agreement. So that being the case, we believe it's clear the Affirmative Defense is barred as a matter of law. My client filed a motion for summary judgment, or actually, I did on behalf of my client, and the only matters in dispute at that time were three items. Mr. Williams denied the note was in default, and we believe the terms of the note show it clearly was. It matured on March 31st of 2011. Secondly, they denied the amount due in owing, and we presented a competent affidavit that was uncontroverted by a representative of my client, and the note terms clearly provide for reasonable attorney's fees, so my client's entitled to those as well. As to the issue of discovery, Mr. Williams had over a year to seek any discovery he wanted. Was the denial of the discovery request in the form of an order? Did the trial court rule on the discovery request? He filed a motion to compel right at the end that came about all at the same time we had the summary judgment motion. Did the trial court rule on that? Yes, and I know they had adequate time to do that, but also the issue was... Excuse me. Has that been appealed? No. Okay, so is that an issue here? I don't think so, no, but I'm trying to appeal to fairness that we did everything we could to try to work with these people, and they had an opportunity to seek any discovery that they wanted, and the only thing we got was at the last minute on a request to produce that was the day before the hearing on the motion for summary judgment, and we responded immediately saying there isn't anybody, so there's nothing there. There was an appeal of the motion to reconsider and the motion to clarify the court's order, and I would like to touch on that just for a second. I think the trial court's order was very clear that the court found due notice was given that it had jurisdiction of the subject matter of the parties, and the court said it had heard the pleadings, the request to admit facts, the responses, the affidavits, heard the arguments of counsel in opening court, and it made a specific finding that there was no written agreement extending the credit agreement presented, and that means that the court found that the credit agreement applied and it properly granted summary judgment on that basis. So I think clearly that my client proceeded in a proper manner, the court ruled in a proper manner, and the court's decision should be affirmed. I too will be brief. I'm happy to answer any questions. I don't see any questions of Mr. Lindstrom, so we thank you, and we'll have rebuttal if you so choose. Thank you. I guess I would just briefly say the underlying purpose for any of these laws and procedures is to provide litigants a fair and open opportunity to present their cases in court. If my clients are correct, and they never got a chance to testify or appear at trial because the motion was granted, there was an extension granted so they could purchase additional product. I don't believe that was refuted. Although it was legally refuted, I don't believe it was factually refuted in the trial court. They did purchase additional product, and at the end, FS, despite its own contract language, now asserts the Illinois Credit Act bars any kind of an extension that isn't in writing. So it would not be a particularly fair circumstance under which my client is deprived of a day in court under circumstances that they've provided affidavits indicating that there was an extension. I think there was an extension of writing, but even if the court doesn't accept the writing part, my client's never got a chance to testify as to the facts of this extension, spending more money at FS as a result of the extension, buying additional product, because the court accepted FS's argument that despite the UCC language in the contract that FS could legally and adequately argue, the Illinois Credit Act controls, so there's nowhere else to go on this case. I would urge the court not to negate or give, in this particular situation, great circumstances in which the UCC provisions don't have effect. I think that Mr. Lindstrom, in essence, conceded my representation to you, Justice Turner, that the documents more or less merged together in the credit agreement, the security agreement, are the same in this. So given that, we think it's clear that the UCC has a role in resolving this case, and we never got to a circumstance in the trial court in which the trial court could review the factual assertions of my client. We believe that the dispute effect does exist, the UCC should be given effect, and we would urge the court to remand this case to the trial court for further proceedings. Any further questions? Mr. Cox, I do have a question, and that is, actually, if you could just confirm what you believe the date of the extension agreement was. And the reason I ask is that it appears that in the answer and affirmative defense that was filed in April of 2012, it's alleged that the extension occurred on April the 22nd of 2010. But then, in James' affidavit, he indicates that it was in June of 2010. I think my client was confused at the time the affirmative defense was drafted and was basically referring to the original contract date. It is my understanding, standing here in August of 2014, that the affidavit provided by Mr. and Mrs. Williams is accurate and that the extension, not the original contract, occurred in June. Thank you. I don't want to testify, but that's my understanding of the facts. Thanks to both of you. Thank you, Your Honor. The case is submitted, and the court stands in recess.